**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KEVIN M. BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-CV-171 AGF |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision that due to medical improvement, Kevin M. Bennett ("Bennett") is no longer entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* as of January 15, 2012. Because the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, the Commissioner's decision will be affirmed.

### I.    Background

On November 3, 2003, Bennett filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* (Tr. 141-143.)  He filed a timely request to amend the claim to reflect a closed period of disability from July 3, 2003, through July 6, 2004.  During this period, Bennett was recovering from multiple bone fractures and arterial injuries which he sustained when he was

1

crushed between a Bobcat (skid steer) and his work truck on July 3, 2003. (Tr. 58.) While these impairments were not sufficient to meet the medical listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, the impairments restricted Bennett to less than sedentary exertion as he was unable to stand and walk up to two hours a day. *Id.* On January 11, 2005, an administrative law judge ("ALJ") issued a fully favorable decision finding Bennett disabled from July 3, 2003, through July 6, 2004. (Tr. 57-61).

On April 11, 2005, Bennett filed an application for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income Benefits, alleging ongoing disability that did not cease on July 6, 2004. On September 8, 2005, an ALJ determined that a fully favorable decision could be issued on the record without the need for a hearing, and held that Bennett's disability did not cease as of July 6, 2004. (Tr. 63-67.) In issuing this decision, the ALJ determined that Bennett continued to suffer from residuals related to multiple bone fractures and arterial injuries from his 2003 accident, as well as related post-traumatic stress disorder (PTSD). (Tr. 64-65.)

On January 18, 2012, Bennett's case was reviewed, and it was determined his condition had improved to the point that he was no longer disabled as of January 15, 2012. (Tr. 73-76.) On April 12, 2012, Bennett filed a Request for Reconsideration. (Tr. 79.) On October 12, 2012, the Social Security Administration issued a Personal Decision Notice of Reconsideration finding that Bennett's health had improved and his disability had ended. (Tr. 103-105.)

Bennett filed a request for a hearing before an ALJ on October 22, 2012. (Tr. 106.) A hearing was conducted on March 1, 2013. (Tr. 27-56.) Following the hearing,

the ALJ issued a written decision on August 20, 2013, finding that Bennett was no longer disabled as of January 15, 2012. (Tr. 8-22.) Bennett requested review of the ALJ's decision by the Appeals Council of the Social Security Administration on October 17, 2013. (Tr. 7.) The Appeals Council denied review on November 28, 2014. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Bennett filed the instant case for judicial review on January 22, 2015. (Doc. No. 1.) The Commissioner filed an Answer. (Doc. No. 9.) Bennett filed a brief in support of his complaint (Doc. No. 17) and the Commissioner filed a brief in support of the answer. (Doc. No. 20-1). The Commissioner also filed a Response to Bennett's Statement of Facts (Doc. No. 22-2), which responded to certain numbered paragraphs in Bennett's brief, and a Statement of Additional Facts. (Doc. No. 22-3.) Bennett did not file a reply and did not controvert the Commissioner's Statement of Additional Facts.

Although Bennett's original injury was physical in nature, and his disability from 2003 to 2012 was based on continued severe physical impairments and the severe mental impairment of PTSD, in this action for judicial review, Bennett argues only that the ALJ erred in determining that Bennett no longer suffers from a severe mental impairment. Bennett raises no argument with regard to the ALJ's finding that Bennett has no continuing severe physical impairment resulting in disability. As such, the Court will address Bennett's purported physical impairments only to the extent they bear upon the alleged mental impairments.

## II.     Administrative Record

### A.     Hearing

The ALJ held a hearing in this matter on March 1, 2013.[1]  (Tr. 27-56.)  Bennett testified and was represented by counsel.

At the time of the hearing, Bennett was 37 years old.  (Tr. 31.)  He has a high school education and completed one year of college.  (Tr. 32, 184.)  He lives alone but has visitation rights with his three children on weekends, who were ages thirteen, nine, and six at the time of the hearing.  (Tr. 45.)  Bennett testified that since his ex-wife started working a late shift, he often takes care of the children during the week. *Id.*  He is able to help his children with homework, make sure they are fed, and take them to and from school.  (Tr. 44-45.)  He is able to do light housework like dusting, laundry, sweeping, and taking out the trash.  (Tr. 46.)  He prunes his rose bushes but no longer cuts the grass due to the vibrations of his riding lawnmower.  (Tr. 46-47.)

Bennett testified that since his workplace accident in 2003, he struggles with stress, anxiety, and depression.  (Tr. 44, 49.)  Due to these problems, at the time of the hearing Bennett reported seeing Dr. Irvin, his psychiatrist, about once a month.  (Tr. 49.)  Bennett testified that he experiences frequent flashbacks to the time of his accident, but that they only cause him to lose his train of thought for a minute or so.  (Tr. 49-50.)

Bennett has worked as a seasonal usher at Busch Stadium for the past six years.  (Tr. 33, 35.)  He works for three to four hours at a time and up to seven to eight days in a

---

[1]     The record is further supplemented with Bennett's responses at a Disability Hearing on October 10, 2012.  (Tr. 83-93.)

row. (Tr. 33, 90.) His duties are to show people where their seats are and "just pretty much keep an eye on the crowd." (Tr. 33.) He testified that he usually arrives at the stadium an hour before the game begins and leaves when dismissed by his supervisor after the game ends. *Id.* He works every St. Louis Cardinals home game unless there are conflicts with his children's activities. (Tr. 33-34.) He sometimes drives himself and parks up to five or six blocks away; other times, he takes the Metrolink to the stadium. (Tr. 35.) Bennett noted that he is afforded special accommodations, like being able to take an extra break whenever he needs to. (Tr. 34-35.)

Bennett also testified that he worked for Don Brown Automotive Group for several months in 2008. (Tr. 36.) His duties were to fill orders and drive those orders to company shops. *Id.* In the course of his employment he drove a truck or a van, lifted up to 15 or 20 pounds, and had a commercial driver's license. (Tr. 37.) He worked 20 to 25 hours a week. (Tr. 48.) He testified that someone helped him load and unload if he was transporting anything heavy. *Id.* Although he felt it burdened the other employees that they had to stop and help him, Bennett gave no indication that the work hours or job requirements were too much for him to handle. (Tr. 37.) His employment at Don Brown Automotive Group ceased when the company went out of business. *Id.*

At the time of the hearing, Bennett testified that he was consistently taking Adderall, Xanax, and Percocet. (Tr. 42.) He testified that the Percocet, a painkiller, was prescribed as needed, but that he was taking it "pretty much every day" because the winter weather affected his arthritis and other injuries. (Tr. 43.) He testified to using

Xanax about three times a week, mostly to fall asleep at night, and to taking Adderall every day to treat his attention deficit disorder (ADD). *Id.*

Bennett testified to being a "people person," though he admitted to sometimes having a "shorter chain" and not putting up with "nonsense." (Tr. 44.) He testified that his job at Busch Stadium was the perfect fit because he has the chance to talk to three million different people each year. (Tr. 52-53.) Bennett has no memory problems in general. (Tr. 43.) He reports trouble focusing while reading and trouble remembering what he read. (Tr. 44.)

### B. Function Report

Prior to the hearing, Bennett also completed a Function Report. (Tr. 192-202.) In the report, Bennett explained that on a day-to-day basis, he makes himself a meal when he wakes up, takes his children to school, and performs cleaning around the house. In addition to taking care of his three kids, Bennett feeds, waters, and grooms a small pet dog. He reported that he cuts his grass on a riding lawnmower, does laundry, and keeps his property clean. In the report, Bennett stated that he follows directions well, has respect for authority, and gets along well with others. He stated that he is afraid to be around heavy machinery, and that often wakes up due to physical pain.

### C. Medical Records and State Consultants

The ALJ summarized Bennett's medical records at Tr. 13-21. Relevant medical records are discussed as part of the analysis. The Court further relies on the parties' statements of fact that were admitted or not controverted.

In addition to Bennett's medical records, the ALJ drew upon the opinions of several non-evaluating state psychiatric consultants. On January 10, 2012, state psychiatric consultant Dr. Joan Singer, Ph.D., reviewed the evidence of record and opined that Bennett had no severe mental impairment. (Tr. 255-65.) On January 11, 2012, state psychiatric consultant Dr. James Morgan, Ph.D., reviewed the evidence of record and also opined that Bennett had no severe mental impairment. (Tr. 281-91.)

### D. Interrogatories Submitted to Vocational Expert

The ALJ submitted interrogatories to vocational expert Theresa Wolford ("Wolford") on June 11, 2013, wherein she posed the following hypothetical:

> Assume a hypothetical individual who was born on March 10, 1975, has at least a high school education and is able to communicate in English . . . . Assume further that this individual has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can frequently climb stairs and ramps, and occasionally climb ladders and scaffolds. He can frequently balance, stoop, kneel, crouch, and crawl.

(Tr. 227.) The ALJ then asked whether the hypothetical individual described could perform any unskilled occupations with jobs that exist in the national economy.

Wolford responded that such an individual could perform unskilled work, and stated that the following jobs would be available: order clerk, Dictionary of Occupational Titles ("DOT") 237.367-014, sedentary work, SVP of 2, with approximately 19,000 such positions existing in the national economy; final assembler, DOT 713.687-018, sedentary work, SVP of 2, with approximately 229,000 such positions existing in the national

economy; and table worker, DOT 739.687-182, sedentary work, SVP of 2, with approximately 411,000 such positions existing in the national economy.  (Tr. 234.)

### III.  Decision of the ALJ

The ALJ determined that Bennett had been disabled as of July 3, 2003, but that as of January 15, 2012, his disability ended due to medical improvement.

For medical improvement purposes, the ALJ indicated that the most recent favorable medical decision finding Bennett disabled was dated September 8, 2005 (the "comparison point decision" or "CPD").  (Tr. 13.)  On that date, Bennett had the impairments of "residuals related to multiple fractures and arterial injuries, and post-traumatic stress disorder."  *Id.*  Because Bennett's PTSD amounted to an inability "to maintain the concentration, persistence, and pace required to perform competitive work activity on a sustained and day-to-day basis," Bennett was found to be disabled at that time.  *Id.*

The ALJ determined Bennett had not engaged in substantial gainful activity from July 3, 2003, until the disability ended on January 15, 2012, or since.  *Id.*  The ALJ noted that Bennett's part-time work as an usher for the St. Louis Cardinals, while not substantial gainful activity, was some evidence "that his impairments may not be as limiting as alleged."  *Id.*  The ALJ found that as of January 15, 2012, Bennett had the medically determinable impairments of a "status post fracture of the pelvis with degenerative arthritis and proximal femur fracture," which caused more than minimal limitation on the claimant's ability to perform basic work activities.  (Tr. 13.)  The ALJ also found that Bennett had been diagnosed with depression and PTSD, but that these

mental impairments now caused only minimal work-related limitations. *Id.* No new impairments were developed after the CPD. (Tr. 15.)

The ALJ found that no impairment or combination of impairments met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14.) The ALJ further found that Bennett had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except that he can frequently climb stairs and ramps, can occasionally climb ladders and scaffolds, and can frequently balance, stoop, kneel, crouch, and crawl. (Tr. 15.) The ALJ determined that Bennett's medical improvement also impacted his RFC and was therefore related to his ability to work. (Tr. 20.) The ALJ determined, based on the vocational expert's responses to interrogatories, that there are jobs existing in significant numbers in the national economy that Bennett can perform. (Tr. 21.) Thus, the ALJ concluded that Bennett's disability ceased as of January 15, 2012. *Id.*

Bennett appeals the ALJ's decision, arguing that the ALJ's evaluation failed to recognize Bennett's severe mental impairment and gave insufficient weight to the opinion of Dr. Irvin, Bennett's treating psychiatrist.

## IV.    Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §

1382c(a)(3)(A); *see also Brantley v. Colvin*, No. 4:10CV2184 HEA, 2013 WL 4007441, at *2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Once an individual becomes entitled to disability benefits, his continued entitlement to benefits must be reviewed periodically. 42 U.S.C. § 423(f)(1); 20 C.F.R. § 416.994(a). The Commissioner may terminate benefits to a person previously adjudged to be disabled upon substantial evidence that the individual's condition has improved. The continuing disability review process is governed by a sequential analysis contained in 20 C.F.R. § 404.1594(f).

> The regulations for determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to

perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Dixon v. Barnhart*, 324 F.3d 997, 1000–01 (8th Cir. 2003).   The regulations define

medical improvement as:

> [A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994(b)(1)(i).

Thus, the "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits.   *Delph v. Astrue,* 538 F.3d 940, 945–46 (8th Cir. 2008), *cert. denied*, 129 S.Ct. 1999 (2009)).   If there has been medical improvement related to the claimant's ability to work, and the claimant is able to engage in substantial gainful activity, then a finding of not disabled will be appropriate.   *Nelson v. Sullivan,* 946 F.2d 1314, 1315 (8th Cir. 1991).   Medical improvement is related to the claimant's ability to work if an impairment improved to the extent that it no longer meets a listing. *See* 20 C.F.R. § 404.1594(c)(3)(i) ("If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work").

This Court's role on judicial review is to determine whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Pate–Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the ALJ's decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). A court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

## V.     Discussion

Bennett makes two arguments in this action for judicial review of the ALJ's decision to terminate benefits. First, Bennett argues that the ALJ erred in determining that Bennett has no ongoing severe mental impairment. Next, he argues that the ALJ erred by failing to accord proper weight to the opinion of his treating psychiatrist, Dr. Irvin.

### Severe Mental Impairment

Bennett alleges that the ALJ erred in finding Bennett's mental limitations not severe because the ALJ improperly based that finding on Bennett's statements to his doctor that he was "alright" or "doing okay." The Commissioner argues in response that the ALJ's finding was based not on Bennett's verbal reports to Dr. Irvin, but instead, on

his record of improvement with treatment, his normal mental status evaluations, and his activities, including his part-time work. The Commissioner also notes that Bennett's PTSD was adjudged his only severe mental impairment when he was first determined to be disabled in 2005; Bennett's depression and ADD were never determined to be severe mental impairments. (Tr. 66.)

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R §§ 404.1520(c), 416.920(c). Basic work activities mean the abilities and aptitudes necessary to do most jobs, including physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b); 416.921(b). Although severity is not an onerous requirement to meet, it is also "not a toothless standard." *Kirby*, 500 F.3d at 708.

Bennett was previously found to suffer from the severe mental impairment of PTSD stemming from his accident, because Bennett was unable "to maintain the concentration, persistence, and pace required to perform competitive work activity on a sustained and day-to-day basis." (Tr. 13.) In the hearing held in furtherance of the ALJ's instant decision, Bennett testified as to his recurrent nightmares and continued flashbacks to his injury. Bennett's medical records suggest that he received treatment from Dr. Irvin, his psychiatrist, at fairly regular intervals from July of 2003 through 2005. (Tr.

315-367.)  Dr. Irvin noted at various points in 2004 and 2005 that Bennett's affect was anxious (Tr. 343), and that he appeared depressed and stressed out (Tr. 347).  Bennett saw Dr. Irvin approximately two times in 2006, and appears to have missed some additional appointments that year.  In 2006, Bennett conveyed feelings of depression, and Dr. Irvin restarted him on medications.  (Tr. 334.)

From 2007 through 2009, however, Bennett was prescribed Xanax, Effexor, and Adderall, and Dr. Irvin noted that during his visits, Bennett's affect was generally unremarkable or calm (*see, e.g.*, Tr. 323), and he was not suffering side effects from his medications.  (Tr. 323, 325, 326, 329.)  In 2007, Bennett appears to have seen Dr. Irvin only one time, and again had several missed appointments.  In 2008, he saw Dr. Irvin twice, and reported mostly situational stressors including separation from his wife.  He also appeared to miss two appointments in 2008.  He saw Dr. Irvin twice in 2009, but the focus of one session appeared to be grief stemming from the death of his grandfather.

Bennett had no visits with Dr. Irvin after April 2009 until late November of 2012, after his disability was denied.  During that 2012 appointment, Bennett reported that the prescribed medications—particularly the Adderall and Xanax—continued to work well for him (Tr. 322).  In January of 2013 he saw Dr. Irvin again and reported that "everything's fine" (Tr. 321).  His mood and mental status were recorded as good and generally normal.  *See, e.g.*, Tr. 321-322.  Additionally, Bennett told Dr. Jennings, another treating physician, that he almost never took Xanax and took Adderall only as needed.  (Tr. 304.)  Bennett's testimony in the hearing also suggested that the medications remain helpful, and that Bennett takes the Xanax only as needed to "get a

good night's sleep." (Tr. 43.) And on his Continuing Disability Review Report dated September 1, 2011, Bennett did not note any mental condition that limited his ability to work. (Tr. 177.) Thus, the ALJ relied on substantial evidence in finding that "[d]uring the period at issue, the treatment notes from Dr. Irvin show no significant mental limitations," and in concluding that "[o]verall, the medical records do not show that the claimant has a severe mental impairment." (Tr. 19.)

The ALJ also relied on additional evidence in the record; she noted that Bennett "has maintained employment as an usher for the St. Louis Cardinals for many years," that he testified to being a "people person," and that he uses public transportation to get to work at times. The ALJ found that these facts undermine the idea that Bennett suffers from a mental impairment so severe as to limit his participation in gainful activity. *Id.* In addition, the ALJ highlighted that Bennett cooks, cleans, maintains his personal hygiene, coaches his children's sports teams, and even serves as a referee at children's basketball games without issue. (Tr. 18, citing Tr. 193-197.)

Bennett's only significant counterargument regarding his work with the St. Louis Cardinals, and its implications for his ability to perform gainful activity, is that accommodations are made for his work—for example, he can take a short break if he becomes physically fatigued or experiences pain. However, this argument is not compelling for at least two reasons. First, according to Bennett's testimony at the hearing, any accommodation he receives is based on his physical limitations rather than any mental impairment. But in the instant action for judicial review, Bennett argues only that the ALJ erred in failing to recognize his purported severe mental impairment, and

15

does not suggest that the ALJ erred in her determination of Bennett's physical RFC. Moreover, the ALJ determined that Bennett's physical impairments limit him to sedentary work with certain exceptions. Thus, Bennett's accommodations in his current position were appropriately considered in the ALJ's determination; but, the accommodations do not vitiate the evidentiary value of his employment for purposes of assessing his mental impairment, the only error Bennett raises here.

Thus, in addition to a reasonable interpretation of Bennett's medical records, the ALJ relied on evidence adduced through the hearing in determining that Bennett no longer suffers from a severe mental impairment and that his medications appear to be successful at minimizing the effect of any psychological impairment. Although there is some evidence that could support a contrary result, this Court must determine whether substantial evidence exists to support the ALJ's determination. *Krogmeier*, 294 F.3d at 1022. Based on the record as a whole, including any contrary evidence, the Court concludes that substantial evidence exists to support the ALJ's finding.

**Weight to Treating Psychiatrist**

Bennett further argues that the ALJ failed to accord proper weight to the opinions of Dr. Irvin, Bennett's treating psychiatrist. The Commissioner responds that the ALJ properly determined Dr. Irvin's opinion was inconsistent with the objective evidence.

In February 2013, Dr. Irvin completed a questionnaire in which he indicated that Bennett could not meet competitive standards in a wide variety of areas, including "[r]emember work-like procedures," "[m]aintain attention for two hour segment," "[u]nderstand and remember detailed instructions," "[i]nteract appropriately with the

general public," "[r]espond appropriately to changes in a routine work setting," and "[d]eal with normal work stress." (Tr. 317-18.) This was a checkbox form, and Dr. Irvin provided little if any corroboration for his various assertions. The ALJ determined that Dr. Irvin's conclusory opinions, as stated on the checkbox form, were entitled to no weight. (Tr. 19.) Instead, the ALJ gave great weight to the opinions of Dr. Singer and Dr. Morgan, the two state-appointed psychiatric consultants, who both found Bennett had no continuing severe mental impairments. (Tr. 20.)

In determining a claimant's impairment and resulting RFC, an ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. *Davidson v. Astrue,* 578 F.3d 838, 842 (8th Cir. 2009); *see also Hacker v. Barnhart,* 459 F.3d 934, 937 (8th Cir. 2006); *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005). Additionally, "[w]hether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider the following factors in determining what weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as

a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. *Constable v. Colvin*, No. 4:14 CV 1128 CDP, 2015 WL 5734977, at *15 (E.D. Mo. Sept. 29, 2015); 20 C.F.R. § 404.1527(c)(2)-(6).

Here, the ALJ gave a thorough analysis of Dr. Irvin's opinions, and explained in significant detail the reasons for affording Dr. Irvin's work-related opinions no weight. (Tr. 19-20.) The ALJ explained that "[d]uring the period at issue, the treatment notes from Dr. Irvin show no significant mental limitations," (Tr. 19), and noted that throughout Dr. Irvin's treatment notes, there is ample evidence that the medications prescribed to Bennett were effective, that his mental status was normal, and that Bennett repeatedly self-reported that he was doing well.

Indeed, as noted previously, Bennett's medical records from Dr. Irvin indicate that his medications were successful in mitigating the lingering effects of any psychological trauma related to his accident. The medical records suggest that Bennett's regimen of Xanax, Effexor, and Adderall was successful in managing Bennett's mental limitations (Tr. 341, 345, 346). Bennett reported to his treating psychiatrist that the medications worked well for him. (Tr. 322.) "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)); *see also Davidson*, 578 F.3d at 846 ("Impairments that are controllable or amenable to treatment do not support a finding of disability.").

Further, while Dr. Irvin had provided regular treatment prior to 2007 or 2008, Bennett had not seen Dr. Irvin for several years prior to the non-renewal of his disability benefits. Bennett saw Dr. Irvin only twice in the time period from April 2009 to the date Dr. Irvin completed the checkbox form, and yet Dr. Irvin wrote on the form that he saw Bennett "every few months." (Tr. 315.) Moreover, Dr. Irvin's own treatment notes specifically undermine his opinions as reported on the checkbox form. For example, while Dr. Irvin stated on the form that Bennett was unable to meet competitive standards with regard to "[adherence] to basic standards of neatness and cleanliness," and "[maintaining] socially appropriate behavior," just one month prior, in January of 2013, Dr. Irvin wrote in his notes that Bennett was "well groomed, well dressed, cooperative and friendly." (Tr. 321.) Indeed, throughout his treatment notes from 2004 through 2005, Dr. Irvin consistently noted that Bennett was well dressed and groomed. (Tr. 323-365.) Elsewhere on the form, Dr. Irvin opined that Bennett could not "[r]emember work-like procedures," or "[u]nderstand and remember detailed instructions," but Dr. Irvin's January 2013 and November 2012 treating notes suggested that Bennett's thought process was "goal directed and logical, [with] no flight of ideas, or looseness of associations." (Tr. 321-22.) While Dr. Irvin summarily opined that Bennett could not "[d]eal with normal work stress," or "[m]aintain attention for [a] two hour segment," his treatment notes in January 2013 stated that Bennett's mood was good, that "Adderall helps his attention," and that he self-reported doing very well. (Tr. 321.) And as a final example, while Dr. Irvin opined that Bennett would not be able to "use public

transportation," Bennett's hearing testimony suggests that he regularly did so without incident. (Tr. 35.)

Thus, Dr. Irvin's own treatment notes and Bennett's other medical records, in combination with the fact that Bennett has consistently worked at his job for the St. Louis Cardinals and has held other jobs successfully in the past, undermine Dr. Irvin's conclusory assertions regarding Bennett's work-related abilities. Moreover, a physician's checkmarks on a form are the precise type of conclusory opinions that carry little evidentiary value when unsupported by medical evidence or elaboration. *See Anderson v. Astrue*, 696 F.3d 790, 793-94 (8th Cir. 2012) (internal citation omitted); *see also Stormo v. Barnhart*, 377 F.3d, 801, 805–06 (8th Cir. 2004); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001); Social Security Ruling 96–2p. There is no deference for a treating physician's conclusory opinion that a claimant is disabled or cannot be gainfully employed because it invades the province of the Commissioner on the ultimate disability determination. While Dr. Irvin did not make that precise finding, the checkbox form he completed—with questions such as "Has your patient's impairment lasted or can it be expected to last at least twelve months?"—is clearly engineered to convey Dr. Irvin's opinion that Bennett cannot be gainfully employed. Because that opinion is not consistent with the remainder of the record, or indeed with Dr. Irvin's own treatment notes, the ALJ was reasonable in assigning it no weight.

Bennett also argues that the ALJ failed to apply the factors set out in 20 C.F.R. §§ 404.1527 and 416.927, as required when rejecting the opinion of a treating physician. While the ALJ did not specifically lay out the factors noted above and address each one

in turn, she did consider the factors in determining that Dr. Irvin's conclusory opinions were not entitled to weight. The ALJ named the specific, work-related conclusions of Dr. Irvin, and methodically stated the evidence, primarily from the hearing and related to Bennett's ability to maintain employment with the St. Louis Cardinals, that contradicted Dr. Irvin's conclusions. (Tr. 19.) Thus, the ALJ properly considered the degree to which Dr. Irvin's opinions are supported by the relevant evidence, the consistency between the opinion and the record as a whole, and additional factors that contradicted Dr. Irvin's opinions.

Finally, Bennett argues that the state-appointed psychiatric consultants' opinions that Bennett has no continuing severe mental impairment are not entitled to weight because they did not examine Bennett. It is true that "[n]ormally, the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not constitute substantial evidence on the record as a whole." *Constable*, 2015 WL 5734977, at *17 (citing *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003)). However, for the reasons stated above, the Court determines that here, the state-appointed psychiatric consultants' opinions provide evidence to support the ALJ's determination, inasmuch as the ALJ also conducted an independent review of the record, and the opinions of the state-appointed psychiatric consultants were consistent with the contemporaneous medical records generated by Dr. Irvin, with the exception of his conclusory findings. The ALJ's determination is also supported by Bennett's part-time work history, and Bennett's own testimony and statement in his Continuing Disability

Review Report.  As such, the ALJ did not rely on the opinions of the non-treating psychiatric consultants alone.

The Court finds that the ALJ's decision is supported by substantial evidence in the record, including medical evidence, and that she accorded proper weight to the treating physician's opinions.  *See Krogmeier*, 294 F.3d at 1024 (finding substantial evidence in the record to support the assigned RFC, though opinion of treating physician was discounted, where ALJ relied on medical records and contemporaneous opinions, the opinion of a consulting physician, claimant's apparent lack of motivation, and claimant's testimony regarding daily activities).  As such, the Court will affirm the ALJ's determination.

## VI.     Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

**AUDREY G. FLEISSIG**
**UNITED STATES DISTRICT JUDGE**

Dated this 29th day of March, 2016.